FILED

CIRCUIT COURT OF THE 20th JUDICIAL CIRCUIT
IN AND FOR LEE COUNTY, FLORIDA



2013 DEC 26 PM 1:39

13 - CA - 002976
Judge: Laboda, Alane C

**PAULA BONNAFANT**, an individual,

Plaintiff,

v.

**CHICO'S FAS INC.**, a Florida corporation,

Defendant.

CIVIL ACTION

Case No.

Judge:

2:13 -cv - 893 -FtM-29 UAM

## COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW COMES** the Plaintiff, **PAULA BONNAFANT** ("BONNAFANT"), by and through her attorney, and states the following for her Complaint:

### CAUSES OF ACTION

1.     This is an action brought under Florida's Private Whistleblower Statute § 448.102 for (1) violation of Florida Statute § 448.102.

### PARTIES

2.     The Plaintiff, **PAULA BONNAFANT** ("BONNAFANT") is an individual and a resident of Florida who at all material times resided in Lee County, Florida.

3.     Defendant, **CHICO'S FAS, INC.** ("CHICO'S") is a Florida corporation with a principal place of business located in Fort Myers, Florida, and employed **BONNAFANT** at its Fort Myers, Florida corporate headquarters, which is located within Lee County, Florida.

4.     At all times relevant to the instant action was **BONNAFANT**'s employer within the meaning of Florida Statute §448.

EXHIBIT 1
Page 1 of 18

## JURISDICTION AND VENUE

5.     This Court has jurisdiction of this matter under F.S. § 26.012.

6.     Venue is proper in Lee County under F.S. § 47.011 because the Plaintiff resides in, and the Defendant conducts business in, and some or all of the events giving rise to Plaintiff's claims occurred in Lee County, Florida.

## GENERAL ALLEGATIONS

7.     **BONNAFANT** was hired by **CHICO'S** on or about August 2009 as contractor and January 2011 as a Full Time employee as a women's handbag designer.

8.     **BONNAFANT**'s job duties included, among others, designing original handbags for **CHICO'S** and following direction from Phyllis Cerato as to specific styles of women's handbags to be designed that **CHICO'S** felt would be most marketable and profitable.

9.     **BONNAFANT** received training from her supervisors and various other **CHICO'S** employees.

10.     However, while **BONNAFANT** was to be creating "original" handbags, her direct supervisor consistently rejected **BONNAFANT**'s original designs in favor of direct duplicates or "knock-offs" of other designer's original and already marketed designs. **BONNAFANT** was often instructed to copy these designs, the only differences between the true designers handbags and the **CHICO'S** version was the **CHICO'S** logo.

11.     **BONNAFANT** first discussed her concerns and objections to being forced to "design" knock-offs with Phyllis Cerato, Accessory Design Director and Megin Santos, Scarf Designer in or about May 2011.

2

EXHIBIT 1
Page 2 of 18

12.     At that time, **BONNAFANT** discussed that she did not feel comfortable copying designs and that she was concerned that she as a designer, as well as the company, could get into serious legal trouble as a result.

13.     This discussion took place in the midpoint conference room after a weekly meeting when the subject came up. The discussion became heated and **BONNAFANT** was told not to use the term "knock-off," and that instead she was to say "inspired by" other designer labels.

14.     **Phyllis reprimanded BONNAFANT** shortly after this discussion.

15.     A **CHICO'S** employee had asked **BONNAFANT** about a designer replica that the handbag team, including **BONNAFANT**, was creating.

16.     **BONNAFANT** mentioned the discussion with Phyllis; however, **BONNAFANT** used the term "knock-off" and Phyllis became furious, telling **BONNAFANT** never to use that language again.

17.     **BONNAFANT** next addressed a Marc Jacobs knock-off that Megin and Phyllis had sampled, specifically mentioning that it was exact color, shape, texture and that **BONNAFANT** thought must be changed.

18.     Phyllis allowed **BONNAFANT** to design it with changes but Phyllis eventually used the original design for production.

19.     On another occasion, on or about June, 2011, Phyllis instructed **BONNAFANT** to have one vendor copy another vendor's design.

20.     **BONNAFANT** vehemently objected and as a result, Phyllis allowed **BONNAFANT** to sample the bag with both vendors.

3

**EXHIBIT 1**
**Page 3 of 18**

21.     Again, Phyllis chose the knock-off version but **CHICO'S** legal department objected to how close it was copied and required changes be made.

22.     This occurrence was frequent.

23.     In fact, a **CHICO'S** belt designer, Aryam, also refused to "design" knock-offs. Aryam too was not exempt from the retaliation; she was actually demoted shortly after discussing with Phyllis that she did not want to copy designs. Aryam had been with the company for approximately six years prior without any incident.

24.     **BONNAFANT** had been with the company for over a year without incident.

25.     Ms. Bonnafant discussed the knock-offs with Lisa Kreitzer (production manager) as well as with Jessica Fowler (production director).

26.     When **BONNAFANT** first discussed the issue with Lisa, in May of 2011, **BONNAFANT** was in Lisa's office and told her that Phyllis did not allow her to develop original designs and that the majority of the handbags were knock-offs that Phyllis was having **BONNAFANT** put into work (sketching and creating tech packs).

27.     A few weeks later, **BONNAFANT** was speaking with Lisa again and Lisa mentioned that Phyllis would no longer be designing the bags because she addressed the subject with Rooham, who was Phyllis's counterpart in production. However, Rooham was fired awhile afterwards and Phyllis continued with the knock-offs.

28.     Phyllis's approach towards **BONNAFANT** was not pleasant from this discussion on and **BONNAFANT**'s work environment became hostile.

29.     **BONNAFANT** suddenly received her first write-up within a month of first speaking with Lisa.

4

**EXHIBIT 1**
**Page 4 of 18**

30.     It was not legitimate that **BONNAFANT** was told that everyone in the production department had complained about **BONNAFANT**'s performance.

31.     **BONNAFANT** then met with Jessica Fowler, the director of production, to find out what was going on. Until the time **BONNAFANT** met with HR and Phyllis to receive the first the write-up, **BONNAFANT** was unaware that Phyllis or production had any problems with **BONNAFANT**'s performance.

32.     **BONNAFANT** spoke to Jessica about the knock-offs and the development process and **BONNAFANT** told her that she objected to copying designs and that often Phyllis would bypass my client and bring the design requests to production team directly.

33.     Jessica sympathized with **BONNAFANT** and said that she had noticed the knock-offs as well.

34.     Before Phyllis joined the team, the accessory product at **CHICO'S** was unique to other product in the market.

35.     The knock-offs were addressed with Lisa and Jessica awhile after as well, and Lisa had strongly suggested that a couple "Prada knock-offs" be brought to the legal department for review.

36.     **BONNAFANT** told her that she could not do so without Phyllis's permission (Phyllis was traveling).

37.     **BONNAFANT** knew that her job was on the line and Phyllis already had conversations about previous handbag knock-offs with legal.

38.     Lisa pushed for **BONNAFANT** to bring the bags, and eventually emailed Jessica Fowler to force **BONNAFANT** to do so.

**EXHIBIT 1**
**Page 5 of 18**

39.     **BONNAFANT** met with Jessica who asked **BONNAFANT** to explain why she would not bring the bags to legal.

40.     **BONNAFANT** informed Jessica that she was not allowed to approach legal regarding knock-offs per instructions from her superior.

41.     Megan Santos, Lisa, and Wenja Harrah had always been given this responsibility from Phyllis because Phyllis did not want my client talking with legal about knockoffs.

42.     **BONNAFANT** told Jessica that she was concerned that her job was on the line and that bringing these knock-offs, which Phyllis had created, to legal could cause **BONNAFANT** to lose her job.

43.     Jessica asked if she could approach Phyllis about them and **BONNAFANT** said 'of course'.

44.     Jessica emailed Phyllis and asked if the bags could be taken to legal, Phyllis responded by telling her not to bring the bags, that they were "interpretations."

45.     After **BONNAFANT** was written up, she addressed all issues and spoke about her concerns that many of Phyllis's complaints were fabricated and that **BONNAFANT** was not allowed to design the handbag line because Phyllis would not let her.

46.     **BONNAFANT** met with Carolyn Ziemski, (Human Resources Director) on several occasions and mentioned her concerns that Phyllis was retaliating because **BONNAFANT** called her out on her unwarranted write-up and that **BONNAFANT** would not be able to succeed in the department because Phyllis no longer wanted my client to be part of it due to her unwillingness to "design" knock-offs.

**EXHIBIT 1**
**Page 6 of 18**

47.     BONNAFANT told Carolyn in HR that most of the bags BONNAFANT designed never made the line because Phyllis would give my client samples of other designers that she wanted BONNAFANT to duplicate instead.

48.     Phyllis would choose the bags that were shown in the final edit; most of the bags BONNAFANT designed were eliminated at or before that point.

49.     Carolyn suggested scheduling a follow-up appointment with Phyllis, herself and my client because of BONNAFANT's concerns, but the meeting was scheduled, cancelled, rescheduled then postponed.

50.     BONNAFANT mentioned to Carolyn that Phyllis was not welcoming or acknowledging the changes BONNAFANT was making (which were requested by Phyllis in the initial write-up) and asked to be transferred to another department where BONNAFANT would have a chance to succeed in the company and not be forced to "design" knock-offs.

51.     Carolyn told BONNAFANT that she was not allowed to transfer within 6 months of a write-up, it had been 5 months.

52.     Shortly after this the meeting was finally scheduled to discuss BONNAFANT's further concerns regarding being required to "design" knock-offs, BONNAFANT was written-up for the second time.

53.     BONNAFANT also spoke to merchandising about the knock-offs (Heather) just before her second write up.

54.     Heather and Jessica Ridgeo had given BONNAFANT a tote bag to knock off while Phyllis was away.

55.     However, BONNAFANT was concerned about copying it exactly and suggested that the company make some changes.

7

EXHIBIT 1
Page 7 of 18

56.     The bag ended up being copied exactly.

57.     The final time **BONNAFANT** complained about the company requiring **BONNAFANT** to design knock-offs was when she filed a complaint against Phyllis just before **BONNAFANT** was fired.

58.     Everyone on the Accessory team, including Wenja, Megin, Aryam, Lisa K, Jessica Fowler, Jessica Ridgeo, Heather Maupin, Jennifer were aware of the knock-offs.

59.     Most were aware that **BONNAFANT** did not want to copy and most were aware the Phyllis initiated the knock-offs. The brand president, Cinny Murray, was aware of the knock-offs as well.

60.     **CHICO'S** terminated **BONNAFANT** as an accessory designer two (2) weeks after she discussed the same in detail with Human Resources and Robin Thomas, and after a subsequent "investigation," after she refused to partake in activity that was in violation of corporate policy and applicable trademark/patent laws.

61.     **BONNAFANT** engaged in protected conduct by voicing her objections in written form and refusing to partake in violations of federal and state law.

62.     **CHICO'S**'s opted to take no investigative steps regarding **BONNAFANT**'s concerns and lawful objections.

63.     Instead, and in retaliation for engaging in statutorily protected conduct, on November 10, 2011, **CHICO'S** terminated **BONNAFANT**'s employment.

64.     As a direct and proximate result of her objection to and refusal to violate Florida Statutes and federal law, **CHICO'S** terminated **BONNAFANT**.

65.     **BONNAFANT** was wrongfully terminated in violation of Florida law.

## COUNT I –VIOLATION OF FLORIDA STATUTE 448.102: FLORIDA'S PRIVATE WHISTLEBLOWER ACT

8

EXHIBIT 1
Page 8 of 18

66.     Plaintiff incorporates by reference Paragraphs 1-65 of this Complaint as though fully set forth below.

67.     **BONNAFANT** was an employee of **CHICO'S**, a private company that employs more than ten (10) employees.

68.     At all material times, **BONNAFANT** was to be protected from negative employment action by Florida Statute 448.102(3), commonly known as Florida's "whistleblower statute," which in relevant part provides:

> "An employer may not take any retaliatory personnel action against an employee because the employee has: (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

69.     **BONNAFANT** did engage in statutorily protected activity by objecting to, and refusing to participate in practices that violated federal and state law, which she communicated to **CHICO'S** in writing.

70.     **CHICO'S**'s direct copying of the designs of legitimate, original hand bag designers, as described above, is in violation of federal and state law.

71.     Two (2) weeks after engaging in statutorily protected activity, **BONNAFANT** suffered negative employment action, her termination, which is a direct result of her statutorily protected activity.

72.     **BONNAFANT**'s termination and her engaging in statutorily protected activity are causally related.

73.     **CHICO'S** knew that **BONNAFANT** was engaging in protected conduct as referenced herein and has acknowledged the same.

9

EXHIBIT 1
Page 9 of 18

74.    **CHICO'S** terminated **BONNAFANT** from her employment and after her employment, threatened, harassed and otherwise discriminated against her because of her protected conduct.

75.    As a direct and proximate result of the violations of F.S. § 448.102, as referenced and cited herein, **BONNAFANT** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path that was anticipated from her employment.

76.    As a direct and proximate result of the violations of F.S. § 448.102, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **BONNAFANT** is entitled to all relief necessary to make her whole.

77.    **CHICO'S**'s negative employment actions against **BONNAFANT** continued until her termination and this count is timely filed.

**WHEREFORE**, Plaintiff demands damages against Defendant for violation of Florida's Private Sector Whistle-blower's Act (Section 448.102, Fla. Stat.), including but not limited to all relief available under Section 448.103, Fla. Stat., such as (a) an injunction restraining continued violation of this act, (b) reinstatement of the employee to the same position held before the retaliatory personnel action, or to an equivalent position, (c) reinstatement of full fringe benefits and seniority rights, (d) compensation for lost wages, benefits, and other remuneration, (e) any other compensatory damages allowable at law, and (e) attorney's fees, court costs and expenses, and (f) such other relief this Court deems just and proper.

## GENERAL CAUSATION AND DAMAGES

78.    As a direct and proximate result of the foregoing claims, Plaintiff **BONNAFANT** has suffered and continues to suffer irreparable injuries relating to losses of income, property,

EXHIBIT 1
Page 10 of 18

and wealth; injury to professional standing; injury to character and reputation; and injury to physical and emotional health and general well-being.

79.    As a direct and proximate result of the foregoing claims, Plaintiff **BONNAFANT** was terminated from her employment at **CHICO'S** and was deprived from her gainful employment.

80.    As a direct and proximate result of the foregoing claims, Plaintiff **BONNAFANT** has suffered damages as stated herein and to be proven at trial, and in an amount to be proven at trial, plus an appropriate amount for her emotional pain and suffering, and punitive damages to be determined.

81.    As a direct and proximate result of the foregoing claims, **CHICO'S** has diminished and deprived and continues to diminish and deprive Plaintiff **BONNAFANT** of the benefits and privileges of her contractual relationship.

## DEMAND FOR JURY TRIAL AND PRAYER FOR RELIEF

Plaintiff **BONNAFANT** respectfully demands a jury trial under the Florida Rules of Civil Procedure and prays for judgment against **CHICO'S**, as follows:

    i.    Declaring that the acts and practices complained of herein are in violation of the whistle-blower protections contained of the state of Florida;

    ii.    Enjoining and permanently restraining the violations of the whistle-blower and anti-retaliation protections contained in the laws of the State of Florida;

    iii.    Directing **CHICO'S** to place Plaintiff **BONNAFANT** in the same position that she would have held but for **CHICO'S**'s discriminatory and retaliatory treatment of her - and to make Plaintiff **BONNAFANT** whole for all earnings and benefits she would have received but for **CHICO'S**'s discriminatory and

11

EXHIBIT 1
Page 11 of 18

retaliatory treatment, including but not limited to wages (including front and back pay) and benefits and any and all other relief afforded under the protections contained in the State of Florida;

iv.   Directing **CHICO'S** to pay Plaintiff **BONNAFANT** general compensatory damages in an amount to be proven at trial;

v.   Directing **CHICO'S** to pay Plaintiff **BONNAFANT** special compensatory damages, including but not limited to actual and anticipated wage loss in an amount to be proven at trial;

vi.   Directing **CHICO'S** to pay the cost of this action together with costs and all reasonable attorneys' fees which arose and were incurred as the results of **CHICO'S**'s violations;

vii.   Declaring **CHICO'S**'s acts against Plaintiff **BONNAFANT** in violation of Florida law as willful, wanton, and malicious, and directing **CHICO'S** to pay Plaintiff **BONNAFANT** punitive damages in an amount to be proven at trial (subsequent to appropriate Motion under Florida law) and;

viii.   Granting such other and further legal and equitable relief as this Court deems proper.

Respectfully submitted,

Dated: October 25, 2013

Benjamin H. Yormak
Florida Bar Number 71272
Trial Counsel for Plaintiff
YORMAK EMPLOYMENT & DISABILITY LAW
9990 Coconut Road
Bonita Springs, Florida 34135
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com

12

EXHIBIT 1
Page 12 of 18